## UNITED STATES v. FANNING et al.

District Court, S. D. West Virginia.
Feb. 22, 1934.

George I. Neal, Dist. Atty., and Okey P. Keadle, Asst. Dist. Atty., both of Huntington, W. Va., and Charles M. Love, Asst. Dist. Atty., of Charleston, W. Va., for the United States.

John R. Pendleton, of Princeton, W. Va., for Fanning.

Alfred G. Fox, of Bluefield, W. Va., for Thornton.

McCLINTIC, District Judge.

At a term of this court, which was held at Bluefield beginning on the 20th day of June, 1933, an indictment was returned by the grand jury at such term against one William Mullens, and also an indictment was returned by the grand jury at such term against one William R. Albert. Each was tried and convicted by a jury, and each was sentenced to a term in the federal prison, and on the 22d and 23d days of June, 1933, respectively, the court, by virtue of process issued under the laws of the United States, committed William R. Albert and William Mullens to the Mercer County Jail, at Princeton, W. Va., in this district, to await transportation to the place at which their sentences were to be served.

At the request of the county authorities of the county of Mercer, the sheriff of Mercer county, the defendant J. C. Fanning was directed to keep William R. Albert until after he had testified as a witness in a criminal case pending in one of the courts of such Mercer county. William Mullens, by coun-

sel, requested that the sentence in his case be suspended until he could make application for an appeal to the Circuit Court of Appeals for the Fourth Judicial Circuit. Accordingly, his sentence was suspended for a sufficient time to enable his counsel to prepare the proper bills of exception, and apply for an appeal.

Both Albert and Mullens, while thus in the charge of the defendant Fanning, as sheriff of Mercer county, and of Thornton, as jailer, appointed by Fanning, escaped from the Mercer County Jail about the hour of 12 o'clock m. on Thursday, the 3d day of August, 1933.

The record in this proceeding shows that the defendant Fanning was duly elected sheriff of Mercer county on the 8th day of November, 1932, and assumed the office and duties of such sheriff on the 1st day of January, 1933, and by virtue of the laws of the state of West Virginia, he, as sheriff, became, from the time he assumed office as such, chargeable with the duties of the office, and likewise it became his duty to assume the custody of the inmates and prisoners in the Mercer County Jail and be responsible for the safe-keeping of such prisoners, and to discharge or release such prisoners only upon the expiration date of their respective sentences, or upon the proper order from a court of competent jurisdiction, and in the case of prisoners placed in his custody by the United States marshal, awaiting transportation to a federal prison, to which they were sentenced, until the further order of such marshal or such District Court.

The defendant C. W. Thornton was duly and legally appointed jailer of the Mercer County Jail on the 1st day of January, 1933, and on that date assumed the duties thereof, and remained continually as day jailer, in sole charge of the jail and the prisoners therein, until and including the 3d day of August, 1933. He was required to be on duty from 7 o'clock a. m. until 7 o'clock p. m. of each and every day during that time. A Mr. ——— Long was night jailer, and was required to be on duty from 7 o'clock p. m. of each day until 7 o'clock a. m. of the next day.

The record further shows that on the 1st day of January, 1932, the United States entered into a contract with the then sheriff of Mercer county, wherein the parties thereto mutually agreed, among other things, as follows: "1st. That during the period of this agreement, the party of the first part agrees to receive federal prisoners, committed by process or order issued under authority of the United States, and to provide for their safe-keeping, care and subsistence."

This contract was in force during the year 1933, and it was under this contract that the prisoners, Mullens and Albert, were received at the Mercer County Jail.

Under this contract, there was paid by the United States to Sheriff Fanning, for the period from the 1st day of January, 1933, to the 1st day of August, 1933, for the keeping and subsistence of prisoners of the United States, the sum of $3,100.35.

Under the law of West Virginia (chapter 7, article 8, § 2 of the Official Code of 1931), the sheriff of each county becomes the keeper of the jail, but he may, with the assent of the county court, appoint one or more jailers. Such jailers may be deputies of the sheriff, and shall take an oath like other officers. Such jailers are removable at the pleasure of the sheriff.

This section further provides certain duties for the sheriff and jailer, and makes the failure on the part of the jailer to perform any of the duties therein required, with respect to any prisoner in his jail, a contempt of any court of record under whose commitment such prisoner is confined, and shall be punished as contempt of such court.

"It is the duty of sheriffs, as ex officio jailers of their counties, to keep literally in jail persons sentenced to confinement therein, except when at labor under some statute authorizing their employment at work as therein directed." State v. Cyrus, 83 W. Va. 30, 97 S. E. 412.

Section 8 of the article and chapter mentioned above provides that the jail of any county may be used for the confinement of persons committed thereto under the laws of the United States, and the jailer thereof shall receive, keep, and discharge such persons pursuant to the commitment, as provided in the laws of the United States.

Under the law of the state of West Virginia, and the contract with the sheriff, the United States had the lawful right to the use of such jail in which to confine prisoners committed by the authority of the United States, and the defendants were charged with responsibility for the execution of the writs of the United States court, as keepers of such jail, and for such purposes they were officers of the United States District Court for the Southern District of West Virginia.

On the 29th day of December, 1933, the district attorney, in due form of law, filed an

information, charging Fanning and Thornton with voluntarily suffering and negligently permitting Mullens and Albert to escape from the jail, in the manner and method set out in such information, and with obstructing the administration of justice, and willfully permitting the escape of such prisoners, and a citation was issued, directing Fanning and Thornton to show cause, on the 16th day of January, 1934, why they and each of them should not be adjudged in contempt of this court.

On that day, each of them appeared, in person and by counsel, and filed their separate answers and returns to such information, so filed.

Later, on the 24th day of January, 1934, the United States, by its district attorney, and each of the defendants, by their respective counsel, appeared, and the court heard testimony relative to the matters and things set up in such information and in such answers.

It was proven that there was an average number of prisoners in this jail, for the period of seven months, from January 1, 1933, to August 1, 1933, of 165 for each day; that the number of prisoners seldom, if ever, ran less than 135, and on some special occasions exceeded the number of 200 at one time; that the defendant Thornton was a man sixty-five years of age, and had had no previous experience as a jailer or in work of like nature; that the only two persons employed by the sheriff, in connection with the keeping of the jail, were Thornton and Long; that no guards or assistant jailers were employed; that under these two jailers, there were employed a number of prisoners in the jail, under the title of "trusties," who performed the duties of cook and cleaners, and in effect guards, for the conduct of the prison and the control of those incarcerated therein.

These "trusties" were appointed or named by the sheriff alone. Apparently no record was kept of their names or the times of such employment, and it was not shown in the evidence (although asked for) how many there were at any one time. However, it seems plain that the number must have been from 7 to 10, including all those classed as such in the whole jail. No salaries or wages were paid to these trusties, but they were given many privileges, such as being allowed to go out of the prison, to visit their homes, to spend week-ends with their families, and not to be locked in their cells, as other prisoners were, and to be allowed the run of the jail.

Apparently, these privileges were considered by the sheriff and the trusties to be full payment for the work done by them in the conduct of the jail. As stated, no money was paid to these trusties by the sheriff for any of their work.

There was paid to each jailer the sum of $126 per month, which, for seven months, would amount to the sum of $1,764.

There was paid to the sheriff, for the keeping and subsistence of state prisoners, the sum of 42 cents per day for each prisoner, and there was paid to the sheriff for the keeping and subsistence of federal prisoners the sum of 55 cents per day for each prisoner.

Thus, taking the average of 165 prisoners for each day, at 42 cents per day, the sum paid to the sheriff for their keeping would be $70 for each day. For 212 days (being the number of days from January 1 to July 31, 1933, inclusive), the total payment to the sheriff therefor would be the sum of $14,840.

As stated above, the payment by the United States to the sheriff for the 212 days was the sum of $3,100.35, which, at 55 cents per day, would amount to the number of 5,637 days. The additional payment of 13 cents for each of these days would amount to the sum of $732.55. For the sake of convenience leaving off the $2.55, the total paid to the sheriff would be $15,570 for the 7 months.

The evidence tended to show that the cost of the food for each prisoner per day was about the sum of 20 cents for each day, although the general belief is that, in many of the jails, the amount is less than that. However, at 20 cents a day for 165 prisoners, the cost would be $33 for the food for one day, and for 212 days the amount would be $7,000. Adding to this sum the amount paid to the jailers, to wit, $1,764, and deducting the same from the total received by the sheriff, there would be left a net profit for the sheriff, for the seven months, of $6,806. In my opinion, this is the minimum, and, in fact, the profits for that period were likely more than this sum.

Under the laws of West Virginia, the sheriff is paid a salary fixed by statute, and the salary of the sheriff of Mercer county is fixed at the sum of $3,800 per annum, and this salary is intended to be in full for his services as such officer. The regular deputies were paid salaries by the county.

In addition, it was shown by the evidence

that the son of Sheriff Fanning, a boy now eighteen years old, kept, in a place apparently provided for such purpose in the jail, such articles as candies, cigarets and other forms of tobacco, chewing gum, potted ham and crackers, and possibly other articles, for sale to the prisoners, which sales, according to the evidence of the young man, who was attending school, were made by these trusties, and the profits came to him. The amounts of such profits were not shown by the evidence.

The reason I set this out in this opinion is: Was it not gross negligence on the part of the sheriff to turn over to one man like Thornton, sixty-five years old, and without any proper experience, the management and control of an average of 165 prisoners confined in this jail? Thornton testified that his duties required him to keep the books—that is to say, the books which showed the incoming and outgoing of all prisoners—to receive all prisoners at the entrance while he was on duty, to receive all food supplies brought into the jail, and generally to be in sole charge of the jail, in all of its departments, while on duty.

He further testified that it was impossible to do this without the aid and assistance of the numerous trusties, who were, necessarily, not sworn officers, in any way, and who were confined in the jail for some crime, by order of some court.

The sheriff and the jailer each admit that they knew that Mullens and Albert were men of very bad reputation, each being a resident of Mercer county, and that they were generally regarded as outlaws therein.

The jail is what is called a new and modern jail, having been in use for only a short time—probably not more than a year—when the sheriff took office. It is situated on top of the building called the Courthouse building. The entrance is in the basement, where there is a locked, steel barred door from the outside. The jailer's office is in this basement, and he has the opportunity, if he takes the proper seat, where his books are kept, to observe the entrance to the jail, the entrance to the elevator, which goes up to the third story, and the entrance to the stairway, which likewise goes up to the third story. The offices of the clerks, prosecuting attorney, and sheriff are on the first floor of the building. The courtrooms and the jury rooms are on the second floor of the building, with the jail on the top, or third, story of the building. The entrance to the jail proper is either by the stairway, from this basement, or by the elevator from this basement. There is a steel barred, locked door from the basement up the stairway. There is another at the top of the stairway, at the entrance to the jail proper. There is a portion of the jail called the "federal section," where federal prisoners were usually segregated to themselves. There is another portion where colored men are segregated to themselves. There is another portion where the white state prisoners are segregated to themselves. There is another portion set off for the women. There is another portion set off for city prisoners.

Although I personally inspected the jail and the places where the federal prisoners were kept, and the cells from which Mullens and Albert escaped, I do not feel that I can give, on paper, an adequate description thereof, beyond saying that apparently it was the "last word" in jail construction, and that with proper management and supervision by attentive officers, there was no possibility of any prisoner escaping therefrom.

It is shown in the evidence that some days before the escape of the prisoners Albert and Mullens, information was given to the chief deputy United States marshal in this district at Charleston, W. Va., that these prisoners had saws and were sawing bars in the jail, with the expectation of escaping, and this information was promptly communicated to the jailer, the defendant Thornton. The defendant admits receiving this information, and upon examination it was found that in the portion of the jail where these prisoners were then confined, saws had been used for the purpose of making an opening through the iron bars, and a Ford jack, presumably brought in for the purpose of breaking certain bars at the window, was found, and a strong rope, capable of sustaining the weight of two men, was likewise found. Then it was these two men were transferred to a part of the jail called the "sweat" cells.

On my own examination, and from the evidence, it seemed that with any reasonable supervision, it would have been impossible for any prisoners to have escaped from this last place.

There were four cells, with eight prisoners therein. The two federal prisoners were transferred there just one week before they escaped. With them went three state prisoners, and three other state prisoners refused to go.

The question of visitors to Mullens and Albert becomes very important in this case. The evidence of the defendants themselves on this point is that after Albert and Mullens were brought into the jail, there were only

two visiting days, Sunday and Thursday of each week. However, the evidence is conclusive, in my opinion, that certain visitors were allowed to come to see these two persons, practically speaking, any day they wanted to from the time they were incarcerated, after their conviction, until they escaped. In other words, these prisoners had special privileges in the way of visitors, and the visitors were allowed to bring them articles, and hand them through the bars to them, without any inspection or investigation of any kind as to what they were. In that way, the saws and other implements were brought to them, whisky was brought to them, and especially did their visitors make the arrangements with them for their escape after they got out of jail. No proper, or in fact any kind of, supervision was exercised by the sheriff and the jailers over the visitors to these two prisoners. Thornton admits that after the removal of Albert and Mullens from the federal part of the jail to the "sweat cells," he found saws and whisky bottles in the place which they had vacated. With the full knowledge of their previous attempts to escape, and with the full knowledge of what the visitors had brought to them, yet they were permitted to have these same visitors in the sweat cells, without any investigation or supervision of the visitors, or search of them, or search of the articles which were brought by them.

On the Sunday preceding August 3d, Thornton admits taking a victrola to the cell occupied by Mullens, a privilege never before or since given to any other prisoner.

A woman by the name of Mrs. Kelly was a very frequent, if not almost a daily, visitor to see Mullens. She was allowed the privilege of getting as close to him as the open bars would permit, and they were given seats on either side of the bars, and had communication with each other for long periods of time, sometimes as long as an hour and a half or two hours. She was permitted to bring various packages and hand them to Mullens, without search, let, or hindrance. One cannot help but infer that there was an agreement or conspiracy, between this woman and one or more of the trusties, to admit her at any time she wished to enter the jail.

The evidence shows that the trusties distributed liquor in this jail while Albert and Mullens were prisoners therein.

After Albert and Mullens were incarcerated in the sweat cells, they sawed completely two iron bars, so that when they wished they could escape (the exact date of such sawing is not conclusively shown, but it was some time between Sunday and Thursday of the week in which they escaped).

Thursday, the 3d day of August, 1933, was another of the visiting days. On that day the elevator was not running, because the county court thought the expense of the electricity was too heavy, so the entrance to the jail proper on the top floor was by the stairway. As stated before, this stairway had four steel barred doors, but on that fated day each was wide open, and any one could visit the top floor of the jail without let or hindrance, and any one could likewise, without let or hindrance, if they were not locked up in the cells of the jail, go out of the jail by this way.

Mrs. Kelly visited the prisoners, as usual, without search or supervision, and went out to provide the automobile for the escape of the prisoners. She placed it at a point convenient to the jail entrance. Thornton was called to the portion of the jail where the colored prisoners were kept, by a helpful trusty, to quell what was no doubt a pre-arranged disturbance for the purpose of getting his attention. He had to go by the door of the sweat cells on his way to this other portion of the jail. Mullens and Albert kicked out the sawed bars, Mullens crawled through the hole first into the corridor, and immediately went down and got into the automobile; Albert followed through the hole. Then three of the state prisoners followed. They stood, for a few minutes, in a recess where there was a shower bath. Then they went down the stairs, like Mullens had done before them, and all of them got into the automobile provided by Mrs. Kelly and departed.

One of the trusties, the cook, was seated in the basement office, talking over the telephone to a relative, and, happening to glance up, saw the last ones going out of the jail. The sheriff was conveniently absent. Afterwards the sheriff claimed that he made every effort to recapture them. The three state prisoners came back and gave themselves up. Albert later was either arrested, or gave himself up, when he was pursued by federal officers. Mullens is yet at large. The sheriff, by his answer, and in his evidence, stresses his search for Mullens after his escape; but his diligence, if real, comes too late.

The specific charges of negligence on the part of the sheriff are:

First. That he put one comparatively old man, without any experience in that kind of work, in charge of a prison in which there were never less than 135, and usually more, prisoners at one time, all sentenced to jail or

awaiting trial, or having been tried and sentenced and awaiting transportation to some penitentiary.

Second. Instead of employing, out of the ample funds derived from the allowance for the keeping and subsistence of prisoners, the proper persons for such duty, he, by means of giving privileges to prisoners, made some of them into so-called guards, under the name of "trusties."

Third. Allowing the trusties virtually to have control of the jail and of its inmates, and to admit visitors to favored persons, like Albert and Mullens, at, practically speaking, any time they wanted to come in, and permitting special privileges to them when they got in.

Fourth. In permitting visitors, whether on visiting days, or any other day, to come into the jail without proper search of the articles which they had, and without proper search of their respective persons for weapons, saws, jacks, or anything else that might be useful to the prisoners in escaping, or doing any other criminal act in the jail.

Fifth. With full and complete knowledge of the outlaw reputations which Albert and Mullens were known to have, in not especially examining and testing the bars of the cells wherein they were incarcerated for the last week before their escape, and in not especially having the jailer, or some other officer, present at any conversation between them and any visitor, and in not making a full and complete search of every visitor coming to see them, and a full and complete search of every package of every kind that such visitors might want to deliver them, or either of them.

In reference to the first specification, it is proper to call attention to the fact that after the escape, the sheriff showed plainly that he recognized his own negligence in making Thornton jailer by first transferring him from the position of day jailer to that of night jailer, and, second, by absolutely dismissing him on the 4th day of October, 1933.

It appears, from the evidence, that prior to his nomination and election, the sheriff promised the defendant Thornton, presumably for political reasons, to make him jailer if he were elected to the office of sheriff. After his dismissal, Thornton, on the 12th day of December, 1933, together with some other persons, filed certain charges in the circuit court of Mercer county, under chapter 6, article 5, § 6, of the Official Code of West Virginia, to have the sheriff removed from office, because, in violation of such law, the sheriff

had, when expecting to hold the office of sheriff of Mercer county, contracted to sell and let to farm such office, and had agreed and contracted to share with another person a part of the emoluments of such office. In such charges it was averred that the defendant Fanning had entered into a contract with one C. W. Caffee, by which Caffee was to share with the defendant Fanning a part of the emoluments of the office of sheriff, to wit, 40 per cent. of the net profits to be derived from the feeding of prisoners confined in the county jail of Mercer county; also, a contract with one J. H. McMullen to appoint him to the office of court deputy of Mercer county; and also, he agreed, in the event of his election, to appoint one J. E. Kade as one of his deputies, and that Kade should have the privilege of purchasing all of the supplies for the jail, for the feeding of the prisoners confined therein. Incidentally, Kade is now day jailer at such jail.

The law required five signers to such charges, and it is plain, from the evidence, that the defendant Fanning, or some of the deputies interested with him in the office, succeeded in getting two of the five signers to withdraw their names, and the court dismissed the first charges.

Again, on the 28th day of December, 1933, Thornton, through his counsel, again succeeded in having charges filed, based upon the same allegations, for the removal of Sheriff Fanning, and, as shown by the evidence, and admitted by Fanning, this public proceeding was, in my opinion, improperly and illegally compromised by the payment, on the part of Fanning, or some one for him, to Thornton of the sum of $400, and Thornton was permitted to withdraw the charges.

It was gross misconduct on the part of Sheriff Fanning to make the promise he did to Thornton, and in view of the danger to the public, it was worse, if possible, to appoint him to this position of jailer when he became sheriff, and I cannot imagine anything worse than his contract with Caffee to pay him 40 per cent. of what they are pleased to call "profits" from poor starving jail prisoners, and the man who takes such dirty money is no better than the man who promises to give it.

It was evident, from the appearance of Thornton, that he was not physically able to cope with prisoners, and I cannot help but believe that if he had been in his office when the escaping prisoners came down the stairway, he would have amounted to nothing if he had attempted to stop them. He, himself,

testified that when he went around to quell the disturbance in the negro quarters of the jail, he took a number of trusties with him for his own protection.

Therefore, under this specification, the evidence compels me to find as a fact that there was gross negligence at least, if not criminal carelessness, in appointing Thornton as the only official person in charge of the jail from 7 o'clock a. m. until 7 o'clock p. m. of each day.

Second. This specification is based on the fact that it is gross negligence, if not criminal carelessness, to make persons either convicted of crime, or accused of crime, in effect, jailers and jail guards. The mere statement of the principle is sufficient, without any amplification by argument. It requires the sheriff to give them illegal privileges and opportunity for illegal profits, in return for the work done by them. In addition thereto, unless there is some special reason to the contrary, their sympathies, and, in any way they can, without hurting themselves, their help, is with the prisoners. The old adage still holds good, "A fellow feeling makes one wondrous kind." Each one in jail wants his liberty. One cannot help but draw the inference from the evidence here that the unnamed, unproduced, and not found trusties were really controlled by Mullens, who was allowed to have all the money he wanted in the jail.

The third specification relates to the fact that, regardless of what Thornton and Fanning may say, the evidence proves conclusively that the good friend, Mrs. Kelly, was admitted whenever she really wanted to be, without supervision, and without being searched.

The architect of the jail had provided a place where inmates could talk to any visitors, and where it would have been impossible for the visitors to have gotten anything through to the persons on the inside. Other prisoners in the jail were compelled to talk in that way to their relatives and friends, but Mullens, being a favored prisoner, notwithstanding his reputation, was permitted to have his friend, Mrs. Kelly, come to the bars, which were a distance of three inches apart, and there be caressed by her, and anything that she desired to give him went through the bars.

Likewise, the trusties themselves brought him liquors, and likely other articles, and passed them through the bars.

The place provided by the architects for inmates to talk to visitors was a part of the iron door, and the holes therein were so made that one could not even put a cigaret through one of them, and probably not even a match. This situation again illustrates the old adage that in spite of everything the architect may do in the construction of a jail, such jail is not a safe place of confinement for prisoners without a jailer.

The fourth specification has been touched upon somewhat, but it is necessary to reiterate that no person, especially visitors to prisoners with the outlaw reputations of Albert and Mullens, should have been permitted, at any time, to see them without a proper officer being present to hear every word that was said between the visitor and the inmate, and without every package delivered to the prisoners being first carefully searched. This was especially true in this particular case, as both defendants had actual knowledge of the previous attempts to escape, and of the previous visits of Mrs. Kelly.

The fifth specification is but an amplification of the one preceding, with the addition that the jailer should have continually tested the bars of this sweat cell, after the removal of Albert and Mullens thereto. Previous knowledge seems not to have impressed upon the sheriff or the jailer the fact that added caution and care should have been exercised in the case of these two prisoners. Instead of doing that, the jailer very kindly takes up a victrola to them, a privilege never allowed to any one else, and also kindly carried up ice cream by the quart.

The sheriff attempts to make a point in his favor that Mullens was originally arrested with the help of one of his deputies, and that Albert was likewise so arrested. Just why this was brought in, I do not know, because he was arrested by Mr. Peterfish, a state policeman, Mr. Wilson, the chief of police of the city of Princeton, and Mr. Bailey, deputy sheriff. Albert was arrested by Mr. Crawford, a state policeman, Mr. Stacey, a state policeman, and Mr. Bailey.

The record shows that the sheriff appeared as a voluntary witness for Mullens when he was tried in the federal court last June. His evidence was not very material, but apparently he wanted to be helpful.

Summing up the whole situation, here were two bad men, known to be such by the defendants, each sentenced to a long term in the federal penitentiary, each known to have attempted to escape, each known to have had saws and other implements, to be used for the purpose of escaping, delivered to them; yet, notwithstanding this especial knowledge

on the part of each of the defendants, nothing was done for their safe-keeping except they were placed in another cell, where, presumably, there were already five dangerous prisoners.

Necessarily, I am compelled to find as facts the five specifications set out above.

Then, as a conclusion of law, on the basis of those findings of fact, I necessarily hold that the defendant J. C. Fanning and the defendant C. W. Thornton are guilty of actual contempt of the orders of this court.